EDGAR D. BROWN AND PAMELA BROWN, CO-ADMINISTRATORS OF THE ESTATE OF JULIAN DAVID BROWN, AND KAREN M. HELMS, ADMINISTRATRIX OF THE ESTATE OF MATTHEW M. HELMS, PLAINTIFFS V. ERIC R. METER, FRENCH SOCCER NETWORK, EUROPEAN SOCCER NETWORK, NORTH CAROLINA YOUTH SOCCER ASSOCIATION, INC., THE GOODYEAR TIRE & RUBBER COMPANY, GOODYEAR DUNLOP TIRES EUROPE B.V., GOODYEAR LUXEMBOURG TIRES SA, GOODYEAR SA, GOODYEAR LASTIKLERI T.A.S. AND GOODYEAR DUNLOP TIRES FRANCE, SA., DEFENDANTS

No. COA08-944

(Filed 18 August 2009)

**1. Appeal and Error— sufficiency of findings of fact—mixed findings of fact and conclusions of law**

Several of the trial court's findings of fact were improperly classified, at least in part, as findings of fact rather than conclusions of law, and those portions will not be considered when reviewing the sufficiency of the findings of fact.

**2. Jurisdiction— personal jurisdiction—long-arm statute— general jurisdiction—due process—stream of commerce**

The trial court did not err by exercising personal jurisdiction over defendants in an action seeking damages for the deaths of two thirteen-year-old soccer players resulting from a bus accident in Paris, France. The trial court's findings of fact were supported by competent evidence and the findings supported the conclusion of law that defendants purposefully injected their product into the stream of commerce without any indication that they desired to limit the area of distribution of their product so as to exclude North Carolina.

Appeal by Defendants from order entered 1 May 2008 by Judge Gary E. Trawick in Onslow County Superior Court. Heard in the Court of Appeals 10 February 2009.

*Bell, Davis & Pitt, P.A., by William K. Davis, Charlot F. Wood, and Kevin G. Williams, for Defendants-Appellants.*

*Kirby & Holt, L.L.P., by David F. Kirby and William B. Bystrynski, for Plaintiffs-Appellees.*

ERVIN, Judge.

Goodyear Luxembourg Tires SA (Goodyear Luxembourg), Goodyear Lastikleri T.A.S. (Goodyear Turkey), and Goodyear Dunlop

Tires France SA (Goodyear France) (collectively, Defendants) appeal from an order entered 1 May 2008 denying their motions to dismiss for lack of personal jurisdiction and concluding that the "[e]xercise of general jurisdiction over defendants comports with Due Process and does not offend traditional notions of fair play and justice." After a thorough review of the record and the applicable law, we affirm the trial court's order.

Matthew Helms and Julian Brown (Decedents), two thirteen-year-old soccer players who resided in North Carolina, died from injuries suffered in a bus wreck on 18 April 2004 outside Paris, France. Decedents were traveling to Charles de Gaulle Airport in preparation for returning to North Carolina at the time of the accident. According to the amended complaint filed by Edgar D. Brown and Pamela Brown, co-administrators of the estate of Julian Brown, and Karen M. Helms, Administratrix of the estate of Matthew Helms (together, Plaintiffs), on 17 April 2006, one of the bus tires "designed, manufactured and distributed" by Defendants failed when its plies separated. The tire that failed was a Goodyear Regional RHS tire manufactured by Goodyear Turkey, which operates a manufacturing plant located in that country. Plaintiffs sought relief from a series of Goodyear affiliates, including Goodyear France, Goodyear Luxembourg, and Goodyear Turkey on a number of theories arising from an alleged negligent "design, construction, testing, and inspection" of and a failure to warn about alleged latent defects in the Goodyear Regional tire in question.[1]

On 9 March 2007, Defendants filed motions to dismiss predicated on an alleged lack of personal jurisdiction pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(2).[2] The dismissal motions filed by Defendants and other Goodyear affiliates were supported by affidavits executed by Philippe Degeer, the Director and Vice President Consumer Tires E.U. of Goodyear Dunlop Tires Europe B.V.; Hermann Lange, the Finance Director of Goodyear Luxembourg Tires SA and Goodyear SA; Ersin Özkan, Sales and Marketing Director of Goodyear Lastikleri T.A.S., and Korhan Ul'un Beyani, Corporate Secretary of Goodyear Lastikleri T.A.S.; and Olivier Rousseau, General Manager of Goodyear Dunlop Tires France S.A. On 7 June 2007, Plaintiffs filed the affidavit of

1. In addition to Goodyear France, Goodyear Luxembourg, and Goodyear Turkey, Plaintiffs initially sought relief from the Goodyear Tire and Rubber Company, Goodyear SA, and Goodyear Dunlop Tires Europe B.V. in the amended complaint.

2. Dismissal motions were also filed on behalf of Goodyear SA and Goodyear Dunlop Tires Europe B.V.

**BROWN v. METER**

[199 N.C. App. 50 (2009)]

Robert C. Ochs, P.E., P.C. (Ochs). The trial court heard arguments on Defendants' dismissal motions on 11 June 2007, after which it took Defendants' dismissal motions under advisement. On 28 September 2007, Plaintiffs took the deposition of Donn P. Kramer, Director of Product and Supply Chain Management for Commercial Systems for Goodyear Tire and Rubber Company, pursuant to N.C. Gen. Stat. § 1A-1, Rule 30(b)(6). On 6 December 2007, an affidavit executed by Kramer containing additional information relating to the delivery of tires manufactured by Defendants into North Carolina was filed. A final hearing on Defendants' dismissal motion was held at the 10 December 2007 session of the Onslow County Superior Court.[3]

On 1 May 2008, the trial court entered an order denying Defendants' dismissal motions. In denying Defendants' motions, the trial court made the following findings of fact:

1. Matthew Helms of Jacksonville and Julian Brown of Charlotte, two 13-year-old youth soccer players, died from injuries suffered in a bus wreck that occurred on April 18, 2004, near Paris, France. Plaintiffs have alleged that as the decedents rode on a bus headed to the airport in Paris to return home to North Carolina, one of the bus' tires, designed, manufactured and distributed by the Goodyear defendants, failed when its plies separated, causing the bus to leave the highway and overturn.

2. Defendants Goodyear [Luxembourg]; Goodyear [Turkey]; and Goodyear [France] (hereinafter "defendants") moved to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the N.C. Rules of Civil Procedure and N.C.G.S. § 1-75.4.

3. The subject tire that allegedly failed was a Goodyear Regional tire, which was manufactured by defendant Goodyear [Turkey].

4. The subject tire contained information that was written entirely in English, including warnings and directions, U.S. Department of Transportation markings placed on the tire to allow it to be sold in the United States, and markings to show it was manufactured as qualified for sale in the United States.

---

3. Plaintiffs voluntarily dismissed their claims against Goodyear SA and Goodyear Dunlop Tires Europe B.V. on 12 December 2007.

BROWN v. METER

[199 N.C. App. 50 (2009)]

5. The subject Goodyear Regional tire has a U.S. code listing load and pressure ratings that conform to United States standards set by the Tire and Rim Association, the standardizing organization for the tire industry in the United States. The tire also contains a "Safety Warning," written in English, which conforms to the warnings found on all tires for sale in the United States.

6. During the period from 2004 through a portion of 2007, at least 5906 tires made by Goodyear [Turkey] were shipped into North Carolina for sale, although not by the original manufacturer.

7. During the period from 2004 through a portion of 2007, at least 33,923 tires made by Goodyear [France] were shipped into North Carolina for sale, although not by the original manufacturer.

8. During the period from 2004 through a portion of 2007, at least 6402 tires made by Goodyear [Luxembourg] were shipped into North Carolina for sale, although not by the original manufacturer.

9. The number of tires shipped into North Carolina from each of these manufacturers may actually be substantially higher, in that The Goodyear Tire and Rubber Company (hereinafter "Goodyear"), after being noticed for a 30(b)(6) deposition, failed to determine how many vehicles equipped with tires from these foreign defendant manufacturers are imported into the U.S. and shipped into North Carolina for sale each year.

10. The defendants, on a continuous and systematic basis, caused tires to be sent into the United States for sale, and knew or should have known that some of those tires were distributed for sale to North Carolina residents, and the defendants continue to send tires for sale into the United States and know or should know that some of those tires continue to be sold to North Carolina residents on a continuous and systematic basis.

11. The sale of these tires generates substantial revenue for Goodyear, these defendant companies and its related companies.

12. The defendants, as manufacturers, did not have their own distribution system for the sale of their tires, but instead used their Goodyear parent and affiliated companies to distribute the tires they manufactured to the United States and North Carolina.[4]

13. The defendants knew or should have known that tires they manufactured were shipped to the United States through their Goodyear parent and affiliated companies and sold in North Carolina on a continuous and systematic basis.

14. The defendants purposefully and deliberately availed themselves of the North Carolina market for tires and substantially profited from sales of their tires in North Carolina.

15. The defendant companies have continuous and systematic contacts with North Carolina and are conducting substantial activity within North Carolina.

16. Defendant Goodyear [Turkey] is a wholly owned subsidiary of defendant, [t]he Goodyear Tire and Rubber Company, which is based in the United States. All three of the foreign defendant companies are subsidiaries of Goodyear in the United States and as such have additional, abundant ties to the United States.

17. The defendant companies have deliberately attempted to take advantage of the tire market in North Carolina by designing, manufacturing and causing tires to be distributed for sale to the North Carolina market, and those tires are sold in North Carolina.

18. Because all three companies have manufactured tires shipped into North Carolina for sale that by clear implication and inference are used on thousands of vehicles throughout North Carolina, they could reasonably anticipate being haled into court in North Carolina.

---

4. According to Kramer, the ties between the Goodyear Tire and Rubber Company and Goodyear France, Goodyear Luxembourg, and Goodyear Turkey, respectively, were "indirect[.]" For example, Goodyear has "sales marketing offices that develop business plans, sales plans" and determine how the needs associated with those plans would be met. Goodyear's sales marketing office would decide how to obtain the needed product, including whether any needed product would be obtained from a European affiliate. After making this determination, the needed tires would be manufactured, shipped to the United States, and distributed to retailers and similar entities using Goodyear's existing distribution system.

19. The quantity of the defendants' contacts with North Carolina, which includes sales of between 5,900 and 34,000 tires within the state, generating substantial revenues and substantial commercial activity in North Carolina, weighs in favor of a finding of general jurisdiction over the defendants.

20. The quality of those contacts, which include systematic and repeated contacts with the state of North Carolina for the purpose of commerce, along with the defendants' ownership by U.S. corporations doing substantial business in North Carolina, weighs in favor of a finding of general jurisdiction over the defendants.

21. The cause of action in this case is closely related to the contacts with the defendants, in that the defendants are causing substantial quantities of tires they manufactured to be sold in North Carolina, and plaintiffs seek to exercise jurisdiction related to a defect in a tire designed, manufactured, distributed or sold by the defendants.

22. North Carolina has a substantial interest in allowing its citizens a forum for the redress of grievances, especially where two of its citizens have been killed, allegedly by the negligence of the defendants.

23. The foreign Goodyear defendants are not inconvenienced by the trial of this action in North Carolina, in that they do substantial and continuous business in North Carolina, they are subsidiaries of a United States corporation that does substantial and continuous business in North Carolina, and they are represented by the same attorneys as are representing their U.S. parent corporation.

24. The plaintiffs, parents of the deceased boys, would be substantially inconvenienced by litigating this case in foreign countries.

Based on the foregoing findings of fact, the trial court concluded as a matter of law that:

1. The defendants have continuous and systematic ties with the State of North Carolina.

2. The defendants' activities in North Carolina are substantial.

3. The quantity of the defendants' contacts with North Carolina; the nature and quality of those contacts; the source and con-

nection of the cause of action to the contacts; the interest of North Carolina in this cause of action and the convenience of the parties, all weigh in favor of the exercise of general jurisdiction over the defendants.

4. Exercise of general jurisdiction over the defendants comports with Due Process and does not offend traditional notions of fair play and justice.

Based on these findings and conclusions, the trial court denied Defendants' dismissal motions. Defendants have noted an appeal to this Court from the trial court's ruling.

---

On appeal, Defendants contend that the trial court erred in denying their motion for lack of personal jurisdiction. We disagree.

When evaluating personal jurisdiction, the trial court must engage in a two-step inquiry: first, the trial court must determine whether a basis for jurisdiction exists under the North Carolina "long-arm statute," N.C. Gen. Stat. § 1-75.4 (2007), and second, if so, the trial court must determine whether the assertion of personal jurisdiction over the defendant is consistent with applicable due process standards. *Cameron-Brown Co. v. Daves*, 83 N.C. App. 281, 283, 350 S.E.2d 111, 113 (1986). "When personal jurisdiction is alleged to exist pursuant to the long-arm statute, the question of statutory authority collapses into one inquiry[,]" which is whether defendant has the "minimum contacts necessary to meet the requirements of due process." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671, 541 S.E.2d 733, 736 (2001). Specifically, this Court has held that, "when evaluating the existence of personal jurisdiction pursuant to G.S. § 1-75.4(1)(d)," "the question of statutory authorization 'collapses into the question of whether [the defendant] has the minimum contacts with North Carolina necessary to meet the requirements of due process.' " *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 617, 532 S.E.2d 215, 218, *disc. review denied and appeal dismissed*, 353 N.C. 261, 546 S.E.2d 90 (2000) (quoting *Hanes Companies v. Ronson*, 712 F. Supp. 1223, 1226 (M.D.N.C. 1988)).

In examining the legal sufficiency of the trial court's order, our review on appeal focuses initially on "whether the findings are supported by competent evidence in the record[.]" *Better Bus. Forms, Inc. v. Davis*, 120 N.C. App. 498, 500, 462 S.E.2d 832, 833 (1995). "If the findings of fact are supported by competent evidence, we conduct

a *de novo* review of the trial court's conclusions of law and determine whether, given the facts found by the trial court, the exercise of personal jurisdiction would violate defendant's due process rights." *Deer Corp. v. Carter*, 177 N.C. App. 314, 322-23, 629 S.E.2d 159, 166 (2006) (citing *Banc of Am. Secs. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694-95, 611 S.E.2d 179, 183 (2005) (stating that "it is this Court's task to review the record to determine whether it contains any evidence that would support the trial judge's conclusion that the North Carolina courts may exercise jurisdiction over defendants without violating defendant's due process rights")). Except as discussed in detail below, Defendants do not dispute that the majority of the trial court's findings of fact are supported by adequate evidentiary support; therefore, we will base the factual component of our analysis on the undisputed information contained in the trial court's order.

According to N.C. Gen. Stat. § 1-75.4(1)(d), "[a] court of this State . . . has jurisdiction over a person" "[i]n any action, whether the claim arises within or without this State, in which a claim is asserted against a party" who "[i]s engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise." *Id.* N.C. Gen. Stat. § 1-75.4(1)(d) was "intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). "[B]y its plain language the statute requires some sort of 'activity' to be conducted by the defendant within this state." *Skinner v. Preferred Credit*, 361 N.C. 114, 119, 638 S.E.2d 203, 208 (2006), *rehearing denied*, 361 N.C. 371, 643 S.E.2d 591 (2007).

Similarly, "[d]ue process [considerations] prohibit[] our state courts from exercising [personal] jurisdiction unless the defendant has had certain 'minimum contacts' with the forum state such that 'traditional notions of fair play and substantial justice' are not offended by maintenance of the suit." *Cameron-Brown*, 83 N.C. App. at 284, 350 S.E.2d at 114 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95 (1945)). Although a determination of whether the required minimum contacts are present necessarily hinges upon the facts of each case, there are several factors a trial court typically evaluates in determining whether the required level of contacts exists: "(1) quantity of the contacts between the defendant and the forum state, (2) quality and nature of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest in the

forum state, and (5) convenience of the parties." *Cameron-Brown*, 83 N.C. App. at 284, 350 S.E.2d at 114.

Jurisdiction exercised under North Carolina's long-arm statute can be classified as either specific or general. "Specific jurisdiction exists when the cause of action arises from or is related to defendant's contacts with the forum." *Id.*, 361 N.C. at 122, 638 S.E.2d at 210. "General jurisdiction exists when the defendant's contacts with the state are not related to the cause of action but the defendant's activities in the forum are sufficiently continuous and systematic" to permit the General Court of Justice to exert personal jurisdiction over that defendant. *Skinner*, 361 N.C. at 122, 638 S.E.2d at 210 (quotation omitted). "[G]eneral personal jurisdiction" may be exercised pursuant to N.C. Gen. Stat. § 1-75.4(1)(d). *Lang v. Lang*, 157 N.C. App. 703, 706, 579 S.E.2d 919, 921 (2003). "The threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *Woods Intern., Inc.*, 436 F. Supp. 2d at 748 (quotation omitted).

The present dispute is not related to, nor did it arise from, Defendants' contacts with North Carolina. As a result, the issue raised in this case involves general rather than specific jurisdiction. For that reason, the relevant question before both the trial court and this Court is whether Defendants' "activities in the forum are sufficiently continuous and systematic[,]" *Skinner*, 361 N.C. at 122, 638 S.E.2d at 210, a "higher threshold" than that required to support the exercise of specific jurisdiction. *Bruggeman*, 138 N.C. App. at 618, 532 S.E.2d at 219. As a result, we must determine on appeal whether the trial court's findings of fact support its legal conclusion that Defendants had "continuous and systematic contacts with North Carolina," thereby justifying the exercise of general personal jurisdiction over Defendants.

The "continuous and systematic contacts" required for the assertion of general personal jurisdiction must result from actions by Defendant rather than from mere happenstance or coincidence or the actions of others. In order for nonresidents like Defendants to be subject to the general personal jurisdiction of the General Court of Justice, they "must engage in acts by which they purposely avail themselves of the privilege of conducting activities within the forum State[.]" *Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 279, 646 S.E.2d 129, 133 (2007) (quotation omitted). "The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or unilateral

activity of another party or a third person." *Adams, Kleemeier, Hagan, Hannah & Fouts, PLLC v. Jacobs*, 158 N.C. App. 376, 381, 581 S.E.2d 798, 802, *rev'd on other grounds*, 357 N.C. 651, 588 S.E.2d 465 (2003) (quotation omitted). A "critical factor" in assessing "whether a nonresident defendant has made purposeful availment of the privilege of conducting activities within the forum State" is whether the party "initiat[ed] the contact[.]" *Banc of Am. Secs. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 698, 611 S.E.2d 179, 185 (2005), *motion denied*, 2006 NCBS 2 (2006). (quotation omitted).

The necessary "purposeful availment" has been found where a corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298, 62 L. Ed. 2d 490, 502 (1980). In such cases, the United States Supreme Court has reasoned that:

> [I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*World-Wide Volkswagen*, 444 U.S. at 297-98, 62 L. Ed. 2d at 501-02. However, the Supreme Court disagreed over the proper interpretation of the principle enunciated in *World-Wide Volkswagen* in *Asahi Metal Ind. Co. v. Superior Court of California*, 480 U.S. 102, 94 L. Ed. 2d 92 (1987).

In *Asahi Metal*, Justice O'Connor writing for herself, Chief Justice Rehnquist, and Justices Powell and Scalia, stated that:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels

for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

*Asahi Metal*, 480 U.S. 102, 94 L. Ed. 2d 92. On the other hand, in a concurrence joined by Justices White, Marshall, and Blackmun, Justice Brennan stated that:

A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether the participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Asahi Metal*, 480 U.S. at 117, 94 L. Ed. 2d at 108, *Brennan, J., concurring in part and concurring in the judgment.* Justice Brennan described Justice O'Connor's stream of commerce "plus" standard as "a marked retreat from the analysis in *World-Wide Volkswagen*[.]" *Id.*, 480 U.S. at 118, 94 L. Ed. 2d at 107. According to Justice Brennan, a "forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Asahi Metal*, 480 U.S. at 119, 94 L. Ed. 2d at 107. As a result, Justice Brennan concluded that sufficient minimum contacts existed in *Asahi Metal* because "Asahi was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components." *Asahi Metal*, 480 U.S. at 121, 94 L. Ed. 2d at 107.[5] This Court has addressed the issue debated in *Asahi Metal* on several occasions, and has expressly declined in

5. Justice Stevens also concluded that California lacked the authority to assert jurisdiction over the person of the defendant in *Asahi Metal* on the basis of a number of factors, such as the fact that all parties to the litigation in question were foreign nationals, that it would be highly inconvenient for the defendant to be haled into court in California, that all of the relevant events occurred outside the forum state, and that the forum state had no interests that would be protected by an assertion of jurisdiction. However, Justice Stevens did not join the approach adopted by Justice O'Connor in reaching this conclusion. Needless to say, the facts in *Asahi Metal* are distinguishable from the facts at issue here in a number of respects.

those cases to follow the approach to the "purposeful availment" issue advocated by Justice O'Connor in that case.

In *Bush v. BASF Wyandotte Corp.*, 64 N.C. App. 41, 306 S.E.2d 562 (1983), this Court addressed a case brought by a North Carolina plaintiff who was injured while operating a washing machine in connection with her employment. The machine had been manufactured by a Swedish corporation which sold several such machines to a New York distributor, which then, in turn, sold a washing machine to the plaintiff's employer. *Bush*, 64 N.C. App. 41, 306 S.E.2d 562. The defendant corporation made no attempt to exclude North Carolina from the area in which its products were distributed. The Court concluded in *Bush* that, because the defendant corporation "purposefully injected [its] product into the stream of commerce without any indication that it desired to limit the area of distribution of its product so as to exclude North Carolina[,] . . . the courts of North Carolina may lawfully assert personal jurisdiction over" the defendants. *Id.*, 64 N.C. App. at 51, 306 S.E.2d at 568.[6] Thus, the rule applicable in North Carolina prior to *Asahi Metal* was not consistent with the position enunciated in Justice O'Connor's opinion.

A few years later, in *Warzynski v. Empire Comfort Systems, Inc.*, 102 N.C. App. 222, 229, 401 S.E.2d 801, 805 (1991), this Court noted that "[a] majority of the [United States Supreme] Court did not join in the section of the *Asahi* opinion that attempts to question the stream of commerce doctrine;" for that reason, we concluded that "Asahi does not overrule previous cases that follow the stream of commerce theory, including *Bush v. BASF*." *Warzynski*, 102 N.C. App. at 228, 401 S.E.2d at 805. As a result, the *Warzynski* Court concluded that, because the defendant manufacturer, a Spanish company, gave the defendant seller "an exclusive right to sell the heaters in the United States with no limit as to North Carolina[,]" the defendant manufacturer therefore "injected its product into the stream of commerce and subjected itself to the jurisdiction of the courts of this state." *Id.*, 102 N.C. App. at 227-29, 401 S.E.2d at 804.

---

6. The trial court exercised jurisdiction in *Bush* pursuant to N.C. Gen. Stat. § 1-75.4(4)(b), which provides that personal jurisdiction is proper "in any action claiming injury to person or property within this State arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury" that "[p]roducts, materials or thing processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade[.]" N.C. Gen. Stat. § 1-75.4(4)(b) does not apply to this case because the accident in which Decedents were killed did not occur within North Carolina.

**BROWN v. METER**

[199 N.C. App. 50 (2009)]

Similarly, in *Cox v. Hozelock, Ltd.*, 105 N.C. App. 52, 57, 411 S.E.2d 640, 643, *disc. review denied*, 331 N.C. 116, 414 S.E.2d 752, *cert. denied*, 506 U.S. 824, 121 L. Ed. 2d 42 (1992), this Court stated that:

> [W]e cannot agree that the impact of *World-Wide* has been significantly lessened due to the recent Supreme Court decision in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 94 L. Ed. 2d 92 (1987)[,]" because "[t]he Court was evenly split . . . as to the ramifications of *World-Wide* and whether intentionally placing a product in the stream of commerce, without more, provided a sufficient basis for jurisdiction over a foreign defendant."

*Hozelock*, 105 N.C. App. at 57, 411 S.E.2d at 644 (1992). In light of that determination, we held that "the sole act of a manufacturer's intentional injection of his product into the stream of commerce provides sufficient grounds for a forum state's exercise of personal jurisdiction over the foreign manufacturer defendant," thus allowing "the North Carolina court [to] properly invoke personal jurisdiction[.]" *Id.*, 105 N.C. App. at 574, 11 S.E.2d at 644.[7]

In *Carswell Distrib. Co. v. U.S.A.'s Wild Thing*, 122 N.C. App. 105, 107-08, 468 S.E.2d 566, 568-69 (1996), this Court stated:

> Minimum contacts can be found when the out-of-state defendant injects products into the "stream of commerce" with the expectation that the products will reach the forum state. *World-Wide Volkswagen Corp.*, 444 U.S. at 298, 62 L. Ed. 2d at 502. North Carolina courts have applied stream of commerce analysis to support the exercise of personal jurisdiction in defective product cases. *E.g.*, *Warzynski v. Empire Comfort Systems*, 102 N.C. App. 222, 228-29, 401 S.E.2d 801, 805 (1991) (holding a corporation subject to the jurisdiction of our courts when it has "purposefully injected" a product into "the stream of commerce" without limiting the area of distribution "so as to exclude North Carolina"). North Carolina cases that use stream of commerce analysis have not been overruled by the United States Supreme Court's decision in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987). *Cox v. Hozelock, Ltd.*, 105 N.C. App. 52, 57, 411 S.E.2d 640, 644, *disc. review denied*, 331 N.C. 116, 414 S.E.2d 752, *cert. denied*, 506 U.S.

---

7. Personal jurisdiction in *Hozelock* was also determined to be proper pursuant to N.C. Gen. Stat. § 1-75.4(4)(b).

**BROWN v. METER**

[199 N.C. App. 50 (2009)]

824, 121 L. Ed. 2d 42, 113 S. Ct. 78 (1992); *Warzynski*, 102 N.C. App. at 229, 401 S.E.2d at 805.

*U.S.A.'s Wild Thing*, 122 N.C. App. at 107-08, 468 S.E.2d at 568-69. In *U.S.A.'s Wild Thing*, the defendant "entered into a manufacturing agreement with . . . a company that served as the distributor for [a product manufactured by the defendant] throughout the United States, Mexico, and Canada." *Id.*, 122 N.C. App. at 108, 468 S.E.2d at 568. According to this Court, "[b]y shipping [its product] to plaintiff in North Carolina pursuant to this agreement [the distributor] intentionally injected its [product] into the stream of commerce and purposefully availed itself of the benefit of North Carolina markets." *Id.*

After reviewing these decisions, we conclude that the appropriate question that must be answered in order to determine whether Defendants are "subject to the jurisdiction of the courts of this state" is whether Defendants have "purposefully injected [their] product into the stream of commerce without any indication that [they] desired to limit the area of distribution of [their] product so as to exclude North Carolina." *Bush*, 64 N.C. App. at 51, 306 S.E.2d at 568; *but see Putnam v. Triangle Publications, Inc.*, 245 N.C. 432, 96 S.E.2d 445 (1957) (holding that personal jurisdiction could not be exercised over a foreign defendant who sold magazines to distributors within this State, but delivered and surrendered title to the magazines to carriers outside North Carolina); *Moss v. City of Winston-Salem*, 254 N.C. 480, 119 S.E.2d 445 (1961) (holding that personal jurisdiction was not present, even though the Illinois defendant lawn mower manufacturer intentionally placed a lawn mower in the stream of interstate commerce and sold it to an unrelated distributor, which then sold the mower to a business in North Carolina).[8] Thus, we must evaluate the validity of the trial court's decision that Goodyear France, Goodyear Luxembourg, and Goodyear Turkey were subject to the jurisdiction of the Onslow County Superior Court by examining whether the trial court's findings of fact, considered in their entirety, provide an adequate basis for a conclusion that Defendants had "continuous and systematic contacts with North Carolina" in light of the well-established legal principle outlined above.

[1] As an initial matter, we note that several of the trial court's "findings of fact" are improperly classified, at least in part, as findings of

---

8. *Putnam* and *Moss* antedate *World-Wide Volkswagen*; as a result, this Court has stated that "[t]he precedential value of both *Moss* and *Putnam*, by their own reasoning, must therefore yield to the rationale of *World-Wide*." *Hozelock*, 105 N.C. App. at 57, 411 S.E.2d at 643.

fact rather than conclusions of law. In these improperly classified findings of fact, the trial court stated that:

14. The defendants purposefully and deliberately availed themselves of the North Carolina market for tires and substantially profited from sales of their tires in North Carolina.

15. The defendant companies have continuous and systematic contacts with North Carolina and are conducting substantial activity within North Carolina.

*See State ex rel. Utilities Com. v. Eddleman*, 320 N.C. 344, 351, 358 S.E.2d 339, 346 (1987), *later proceeding*, 322 N.C. 689, 370 S.E.2d 567 (1988) (stating that "[f]indings of fact are statements of what happened in space and time"). In light of the fact that these findings involve statements that Defendants "purposefully and deliberately availed themselves of the North Carolina market," "have continuous and systematic contacts with North Carolina," and "are conducting substantial activity within North Carolina," and the fact that these statements amount to determinations that the applicable legal standards have been met rather than "statements of what happened in space and time," we will not include these portions of finding of fact numbers 14 and 15 in our analysis of the sufficiency of the factual findings in the trial court's order to support its conclusion that Defendants were subject to the jurisdiction of the Onslow County Superior Court.

In addition, as another preliminary matter, the trial court stated in finding of fact numbers 17 and 21 that Defendants "caused" a certain number of tires to be shipped into North Carolina. However, the record appears to be devoid of evidence that Defendants took any affirmative action to cause tires which they had manufactured to be shipped into North Carolina. On the contrary, the available evidence tends to show that other entities were responsible for the shipment of tires manufactured by Defendants to the United States and, as a part of that process, the tires arrived in North Carolina. As a result, our analysis of the trial court's findings is informed by our understanding that Defendants, as separate corporate entities, were not directly responsible for the presence in North Carolina of tires that they had manufactured.

Defendants also argue that finding of fact numbers 4 and 5 are not supported by competent evidence because they were "based solely on incompetent statements in Mr. Och's affidavit[.]" We disagree. Findings of fact numbers 4 and 5 state the following:

4. The subject tire contained information that was written entirely in English, including warnings and directions, U.S. Department of Transportation markings placed on the tire to allow it to be sold in the United States, and markings to show it was manufactured as qualified for sale in the United States.

5. The subject Goodyear Regional tire has a U.S. code listing load and pressure ratings that conform to United States standards set by the Tire and Rim Association, the standardizing organization for the tire industry in the United States. The tire also contains a "Safety Warning," written in English, which conforms to the warnings found on all tires for sale in the United States.

Ochs's affidavit reveals that he "traveled to France and personally inspected the tire that is at issue in this case." Ochs discovered the following pertinent information as a result of his inspection of the tire: (1) "[b]ased on the serial number on the tire, which is required by the U.S. Department of Transportation for tires sold in the United States, the tire was manufactured at a Goodyear plant in Izmit, Turkey, owned by Goodyear Lastikleri T.A.S."; (2) "[t]he tire at issue contained additional U.S. Department of Transportation markings that were placed there to allow the tire to be sold in the United States"; (3) "[t]he tire at issue contained information showing that it was manufactured as qualified for sale in the United States"; (4) "[t]he tire at issue had a U.S. code listing load and pressure ratings that conform to United States standards set by the Tire and Rim Association, the standardizing organization for the tire industry in the United States"; (5) "[t]he tire at issue contains a "Safety Warning," written in English, that conforms to the warnings found on every tire for sale in the United States"; (6) "[a]ll of the information found printed on the tire is written in English, and the tire was manufactured and labeled in such a way as to allow it to be sold in the United States"; (7) "[b]ased on my knowledge of tire manufacturing and the European tire market, this tire was designed, manufactured and marketed for sale worldwide, including sale in the United States and North Carolina." These excerpts from Ochs' affidavit contain competent evidence to support the trial court's finding of fact numbers 4 and 5. *See Fox v. Gibson*, 176 N.C. App. 554, 558, 626 S.E.2d 841, 844 (2006) (upholding findings of fact in the context of personal jurisdiction as supported by competent evidence based on information contained in various affidavits). The associated assignments of error are without merit. Because Defendants do not dispute the validity of the remain-

ing findings of fact on appeal, we must now "conduct a *de novo* review of the trial court's conclusions of law and determine whether, given the facts found by the trial court, the exercise of personal jurisdiction would violate defendant's due process rights." *Deer Corp.*, 177 N.C. App. at 322, 629 S.E.2d at 166.

[2] The trial court's factual findings which were either undisputed by Defendant or supported by competent evidence indicate that the tire that Plaintiffs allege was involved in the accident resulting in Decedents' deaths "contained additional U.S. Department of Transportation markings that were placed there to allow the tire to be sold in the United States" and also "contained information showing that it was manufactured as qualified for sale in the United States." More particularly, the tire had "a U.S. code listing load and pressure ratings that conform to United States standards set by the Tire and Rim Association, the standardizing organization for the tire industry in the United States." Moreover, the tire contained "a 'Safety Warning,' written in English[.]" Although Kramer opined that the presence of "DOT specifications" on the relevant Goodyear Regional RHS tire "doesn't necessarily mean that the tire is destined to be used in the United States," the existence of these markings does indicate, as the trial court found, that the tire in question was manufactured in such a manner that it could, if business conditions supported such a move, be sold in the United States. Thus, at an absolute minimum, the manufacturer contemplated that the tire might be sold in this country.

Furthermore, the trial court's findings establish that tires manufactured by Defendants were shipped to the United States for sale and that there was no attempt to keep these tires from reaching the North Carolina market. The evidence tends to show that the extent to which tires manufactured by Defendants were sold in the United States depended on the extent to which Goodyear affiliates responsible for distributing tires in the United States exercised the option that was available to them of having tires needed for sale in the United States manufactured by one of the Defendants. In addition, the trial court found that tires manufactured by each Defendant were actually sold in North Carolina. From 2004 to 2007, 6,402 tires manufactured by Goodyear Luxembourg were ultimately shipped to locations in North Carolina. Similarly, 33,923 tires manufactured by Goodyear France reached North Carolina during the same period. Finally, 4,059 tires manufactured by Goodyear Turkey were shipped into North Carolina for sale during this interval. Furthermore, as the trial court noted, other tires manufactured by Defendants may have

reached North Carolina during this time, since the figures set forth above do not include "vehicles equipped with tires from [Defendants] imported into the [United States] and shipped into North Carolina for sale each year." According to the trial court's findings, the distribution chain through which tires manufactured by Defendants were shipped into the United States and, eventually, into North Carolina, was "a continuous and systematic" process rather than a sporadic or episodic one. As a result, the trial court's findings indicated that, through a regular process employed within the Goodyear organization, a substantial number of tires manufactured by the Defendants were imported into the United States and distributed to various entities in North Carolina.

In addition to the evidence reflecting Defendants' contacts with North Carolina, the trial court's findings reflect that North Carolina has an interest in this proceeding given that Plaintiffs seek redress for injuries sustained by North Carolina citizens. In addition, the record reflects that requiring Plaintiffs, who have no ties to France, to litigate their claims in the French courts would impose a considerable burden on them. Although there is no question but that requiring Defendants to defend an action in the General Court of Justice would be burdensome as well, that burden is alleviated to some extent by the fact that Defendants have corporate affiliates in the United States with business interests in North Carolina, a fact which is simply not true of Plaintiffs.

As in *Bush, Warzynski, Hozelock,* and *U.S.A.'s Wild Thing,* Defendants have, without question, purposefully and intentionally manufactured tires and placed them in the stream of interstate commerce without any limitation on the extent to which those tires could be sold in North Carolina. Defendants also knew or should have known that a Goodyear affiliate obtained tires manufactured by Defendants and sold them in the United States in the regular course of business. The record further demonstrates that several thousand tires manufactured by each of the Defendants eventually found their way into North Carolina markets through the operation of a continuous and highly-organized distribution process. The number of tires at issue in this case is much greater than the number of sales that have been deemed sufficient in other cases, such as *Dillon,* 291 N.C. 674, 231 S.E.2d 626 (deeming 27 sales in North Carolina sufficient to support a finding of general jurisdiction), and *Hankins v. Somers,* 39 N.C. App. 617, 251 S.E.2d 640, *cert. denied,* 297 N.C. 300, 254 S.E.2d 920 (1979) (deeming sales of "wire art" in North Carolina to a "substantial

extent" sufficient to support a finding of general personal jurisdiction). Finally, North Carolina has a well-recognized interest in providing a forum in which its citizens are able to seek redress for injuries that they have sustained, and a greater burden would be imposed upon Plaintiffs in the event that they were required to litigate their claims in France compared to the burden that would be imposed upon Defendants in the event that they are required to defend Plaintiffs' claims in the General Court of Justice. In light of all these facts, Defendants could, consistently with considerations of due process and fundamental fairness, reasonably expect to be subject to the jurisdiction of the North Carolina courts, so that the exercise of personal jurisdiction over Defendants would not violate the due process clause.

Defendants' principal challenge to the trial court's order rests on the assertion that "stream of commerce" analysis simply does not apply in instances involving general, as compared to specific, jurisdiction. Defendants have not cited a North Carolina case to this effect, and we know of none. On the other hand, *U.S.A.'s Wild Thing* does not appear to involve an exercise of specific jurisdiction. Instead of adopting a general rule precluding the use of stream of commerce analysis to support a finding of general personal jurisdiction, we believe that the real issue is the extent to which Defendants' products were, in fact, distributed in North Carolina markets. Although we might agree with Defendants' contention in the event that the record demonstrated that only a few tires reached North Carolina through a limited distribution process, that is not the situation present here. Instead, the trial court's findings reflect that thousands of tires manufactured by each of the Defendants were distributed in North Carolina as the result of a highly organized distribution process that involved Defendants and other Goodyear affiliates. Thus, we believe that, on the facts of this case, sufficient basis exists to support a finding of general personal jurisdiction under N.C. Gen. Stat. § 1-75.4(1)d and the due process clause.

As a result, after a thorough review of the record, and consistent with the principles outlined by this Court in *U.S.A.'s Wild Thing*, 122 N.C. App. 105, 468 S.E.2d 566, *Hozelock*, 105 N.C. App. 52, 411 S.E.2d 640, *Warzynski*, 102 N.C. App. 222, 401 S.E.2d 801, and *Bush*, 64 N.C. App. 41, 306 S.E.2d 56, we hold that the facts found in the trial court's order support its conclusion that Defendants "purposefully injected [their] product into the stream of commerce without any indication that [they] desired to limit the area of distribution of [their] product

so as to exclude North Carolina," *Bush*, 64 N.C. App. at 51, 306 S.E.2d at 568, and thereby purposefully availed themselves of the protection of the laws of this State. The trial court's findings are supported by competent evidence, and the findings in turn support the conclusion that the exercise of general personal jurisdiction over Goodyear Luxembourg, Goodyear Turkey, and Goodyear France was appropriate pursuant to N.C. Gen. Stat. § 1-75.4(1)(d) and the due process clause. As a result, the trial court did not err in exercising general jurisdiction over Defendants and denying their dismissal motions pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(2). Thus, the trial court's order should be, and hereby is, affirmed.

AFFIRMED.

Judges WYNN and STEPHENS concur.